35210. LITTMAN et al. v. SUBURBAN OPTICIANS.

MARSHALL, Justice.

The defendant landlord appeals from the grant of an interlocutory injunction to the plaintiff tenant. The facts and evidence relevant to this appeal are as follows:

In October, 1975, Drs. Irving T. Staley, Gerald E. Sanders and Richard M. Brown, a partnership d/b/a Suburban Opticians, leased Suite 102 in the Smyrna Medical Building from five individuals, as landlord. After the death of Dr. Brown on February 12, 1976, Dr. Staley purchased from the executrix of the estate all of Dr. Brown's interest in the partnership. On April 23, 1976, Dr. Staley filed with the Clerk of Cobb Superior Court a notice of dissolution of the partnership and a notice that he and Dr. Sanders would own and conduct a business under the same trade name, i.e., Suburban Opticians.

Thereafter, in response to an inquiry by a representative of the landlord as to whether Drs. Staley and Sanders wished to be relieved of their obligations under the lease agreement because of the death of Dr. Brown, Dr. Staley advised him that he and Dr. Sanders intended to fulfill their obligations and desired to keep the premises.

The lease contract provides as follows as to term: "3. (a) The initial term of this lease shall commence and the first rental payment shall become due and payable on the seventh day after the Tenant shall have been notified that the premises are complete and suitable for Tenant's use, according to the plans and specifications which have been approved and initialed by the parties, and the initial term of this lease shall end on the 23rd day of June, 1980, at midnight, unless sooner terminated as hereinafter provided." The plaintiffs commenced paying rent on the premises in June, 1976, and continued rental payments through February, 1978, although they did not actually occupy the premises.

In September or October, 1977, Rhodes Realty Company, of which defendant Neal Littman was an agent, took over management of the building and acquired knowledge of the lease agreement. In December, 1977, Littman asked Dr. Sanders if the latter and Dr. Staley were willing to give up Suite 102 and allow it to be leased to another opthalmologist. Dr. Sanders replied that they were satisfied with their space and didn't want to give it up. This inquiry is denied by Littman, who, however, did not deny that he first contacted Dr. Sanders and inquired about the intentions of Drs. Sanders and Staley regarding Suite 102.

In January, 1978, Smyrna Medical Building, Ltd., a limited partnership in which defendants James M. Higgins and Littman were general partners, was formed, and acquired ownership of the building. During January and February, 1978, Littman contacted Drs. Staley and Sanders on several occasions, attempting to persuade them to allow a substitution of rental space in the building. Finally it was *orally* agreed that they would accept as a substitute, Suite 205, which would be prepared. There was no written agreement to this effect, and Suite 205 was never prepared for occupancy by the

plaintiff partnership.

On February 1, 1978, defendant Smyrna Medical Building, Ltd., leased Suite 102 to Color-Art, Inc., which is presently occupying that suite, with rental payments to begin on March 1, 1978. The plaintiffs made rental payments on Suite 102 through February, 1978.

In July, August, September and October, 1978, the plaintiffs unsuccessfully attempted to learn the defendants' intentions regarding Suite 205. The plaintiffs' attorney wrote defendant Littman on November 3, 1978, advising him of their insistence on relying on the very letter of their lease agreement. The plaintiffs testified that they noticed building activity in Suite 205 in early fall of 1978, and blueprints on the wall there dated August, 1978, with the name "E. J. Crary."

In November and December, 1978, the defendants continued preparation of Suite 205 for Dr. E. J. Crary, an opthalmologist. The defendants were served with summons in this case on December 15, 1978. Dr. Crary moved into Suite 205 on January 4, 1979, nearly two months after the defendants were notified that the plaintiffs were insisting on strict reliance on the lease agreement and 20 days after service of summons in the case. No notice of default or demand for payment of rent was ever made upon the plaintiffs.

The lease contract contained the following provisions which are material to this case. "15. It is mutually agreed that in the event the Tenant shall default in the payment of rent herein reserved, when due, and fails to cure said default within thirty (30) days after written notice thereof from Landlord; or if tenant shall be in default in performing any of the terms or provisions of this lease other than the provision requiring the payment of rent, and fails to cure such default within sixty (60) days after the date of receipt of *written notice of default from Landlord;* . . . then, and in any of said events, Landlord at his option may at once or within six (6) months thereafter (but only during continuance of such default or condition), terminate this lease *by written notice to Tenant;* whereupon this lease shall end . . ." (Emphasis supplied.) "26. 'Landlord' as used in this lease shall include first party, heirs, representatives, assigns and successors in

title to premises. 'Tenant' shall include second party, his heirs and representatives, assigns and successors, and if this lease shall be assigned or sublet, shall include also Tenant's assignees or sub-lessees, as to premises covered by such assignment or sublease. 'Landlord,' and 'Tenant,' include male and female, singular and plural, corporation, partnership or individual, as may fit the particular parties." "27. Landlord agrees that during the term of this lease, and any extension thereof exercised by Tenant, that Landlord shall not lease any portion of the building in which premises is located to any other *opthalmologist,* optometrist, optician, or optical dispensary." (Emphasis supplied.) "28. This lease contains the entire agreement of the parties hereto and no representations, inducements, promises or agreements, oral or otherwise, between the parties, not embodied herein, shall be of any force or effect." *Held:*

"Leases involving an estate for years and agreements not to be performed within a year are, of course, within the Statute of Frauds and must be in writing to be effective. Code § 20-401 (4, 5). *Smith v. Top Dollar Stores,* 129 Ga. App. 60, 62 (198 SE2d 690). Moreover, a contract which is required by the Statute of Frauds to be in writing, and which is therefore put in writing, can not be modified by a subsequent agreement in parol. *Gulf Oil Corp. v. Willcoxon,* 211 Ga. 462 (2) (86 SE2d 507); *Jarman v. Westbrook,* 134 Ga. 19 (2) (67 SE 403)." *Krueger v. Paul,* 141 Ga. App. 73, 75 (232 SE2d 611) (1977). " 'Where a landlord treats a lease as assigned, even though the original lessee had no right to assign it without his consent, he is estopped from setting up that the assignment of his contract is made without his consent.' " *Carparking, Inc. v. Chappell's, Inc.,* 96 Ga. App. 862, 865 (1b) (101 SE2d 894) (1958). "[A]n agreement by a lessor ancillary to a leasing of a part of his property, designed to prevent the use of the remainder of his property in a manner competitive with the operation of the lessee's business, is a valid and reasonable restraint of trade." *Webster v. Star Distributing Co.,* 241 Ga. 270, 272 (244 SE2d 826) (1978) and cits. "When forfeiture of a lease depends on giving written notice of default, it must appear that the notice was given in strict compliance with

the contract both as to time and contents and that the default occurred." *Woodall v. Pharr,* 119 Ga. App. 692 (1) (168 SE2d 645) (1969). No written notice of default was given in the case sub judice.

It was not necessary that Dr. Crary be made a party to the action. "The law is that one seeking to obtain property which is involved in litigation does so at his own peril, and is, as to such property, conclusively bound by the results of the litigation." *Blakely & Son v. Humphreys,* 148 Ga. App. 281, 285 (250 SE2d 826) (1978) and cits. The appellant and Dr. Crary acted at their own peril after Dr. Crary had knowledge of the restrictive covenant, the appellant was notified that the appellees intended to rely strictly on the terms and provisions of the lease contract, and summons and complaint were served on the appellant 20 days before Dr. Crary occupied space in the building.

Thus, under the evidence and law set out hereinabove, the lease was valid and binding on the parties, not having been terminated by written notice or violation by the tenants, and the trial court was authorized to enforce the valid restrictive covenant therein by interlocutory injunction as against the appellant landord and the subsequent lessee with notice of the pending litigation. The fact that the appellees may have had other offices in which to conduct their business does not, as the appellant contends, make the grant of interlocutory injunction unnecessary; the appellees were entitled to rely on the use of the leased premises under the terms of the lease contract.

*Judgment affirmed. All the Justices concur.*

ARGUED SEPTEMBER 12, 1979 — DECIDED OCTOBER 30, 1979 — REHEARING DENIED NOVEMBER 21, 1979.

*Harrison & Youngelson, M. David Harrison,* for appellants.

*Edwards, Friedewald & Grayson, Jordan H. Prosser, Scott S. Edwards, Jr.,* for appellee.